**Affirmed and Opinion filed April 30, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00267-CR

**JESUS GABRIEL ZAMARRIPA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 0483100**

## OPINION

A jury convicted appellant Jesus Zamarripa of aggravated sexual assault of a child under fourteen years of age. The jury sentenced appellant to prison for thirty years and assessed a fine of $10,000. Appellant timely brought this appeal, complaining the trial court erred in denying his motion to quash the indictment for violation of his right to a speedy trial. For the reasons stated below, we affirm.

In his sole issue, appellant argues his constitutional right to a speedy trial was violated. An accused is guaranteed the right to a speedy trial under both the United

States and Texas Constitutions. *See* U.S. Const. amend. VI; Tex. Const. art. I §10. Texas courts apply the same standard to enforce the state constitutional right to a speedy trial as federal courts use to enforce the Sixth Amendment right to a speedy trial. *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992). We therefore analyze together appellant's claims that these rights were violated. *Ortega v. State*, 472 S.W.3d 779, 785 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

## STANDARD OF REVIEW AND APPLICABLE LAW

The right to a speedy trial attaches once a person becomes an accused; this can be when he is either arrested or charged with an offense. *Henson v. State*, 407 S.W.3d 764, 767 (Tex. Crim. App. 2013). We analyze speedy trial claims on a case-by-case basis by balancing the following factors: (1) length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice inflicted on the defendant by the delay. *Zamorano v. State*, 84 S.W.3d 643, 647–48 (Tex. Crim. App. 2002) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). To trigger a speedy-trial violation analysis, "an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651–52, (1992). If the first *Barker* factor is satisfied, an analysis of the remaining factors is triggered. *Id*. We must analyze the speedy-trial claim by first weighing the strength of each of the *Barker* factors and then balancing their relative weights in light of "the conduct of both the prosecution and the defendant." *Id*. No one factor is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id*. Instead, the four factors are related and must be considered together along with any other relevant circumstances. *Id*. As no factor possesses "talismanic qualities," we engage "in a difficult and sensitive balancing process" in each individual case. *Id*.; *see State v. Wei*, 447 S.W.3d 549, 554 (Tex. App.—Houston

[14th Dist.] 2014, pet. ref'd) ("The defendant's burden of proof varies inversely to the State's degree of culpability for the delay.").

We apply a bifurcated standard of review when considering a trial court's decision to dismiss an indictment because the defendant was denied his right to a speedy trial. *State v. Krizan–Wilson*, 354 S.W.3d 808, 815 (Tex. Crim. App. 2011). Legal components are evaluated *de novo*, while the factual components are evaluated for an abuse of discretion. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008). We give almost total deference to a trial court's findings of fact that are supported by the record, as well as any mixed questions of law and fact that rely upon the credibility of witnesses. *Krizan-Wilson,* 354 S.W.3d at 815. With respect to the trial court's resolution of factual issues, we view the evidence in the light most favorable to the trial court's ruling. *Cantu*, 253 S.W.3d at 282. Review of the individual *Barker* factors necessarily involves factual determinations and legal conclusions, but the balancing test is "a purely legal question." *Id.*

The trial court made findings of fact and conclusions of law on the record August 15, 2016, when it denied the motion to quash.[1] When findings of fact are unchallenged, they are binding on an appellate court unless the contrary is established as a matter of law, or there is no evidence to support the finding. *See Goodson v. State*, No. 09-18-00018-CV, 2018 WL 5060432, at *3 (Tex. App.— Beaumont Oct. 18, 2018, no pet.) (mem. op.) (not designated for publication) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Vasquez v. State*, No. 01-04-01221-CV, 2006 WL 2506965, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2006, pet. denied) (mem. op.) (not designated for publication) (same)). We address those challenged by appellant within his argument on the *Barker* factors in

---

[1] The trial court's findings of fact and conclusions of law are attached as Appendix A.

3

our analysis below. We review *de novo* the conclusions of law drawn by the trial court from the facts to determine their correctness. *See Goodson*, 2018 WL 5060432, at *3 (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)).

## ANALYSIS

A.     *Length of the delay*

This first factor is a double inquiry. *See Doggett*, 505 U.S. at 651. We first "must consider whether the delay is sufficiently long to even trigger a further analysis under the *Barker* factors, and if it is, then the court must consider to what extent it stretches beyond this triggering length." *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017).

The length of the delay is measured from the time the defendant is arrested or formally accused until the trial or the defendant's demand for a speedy trial occurs. *United States v. Marion*, 404 U.S. 307, 313 (1971); *see Ortega*, 472 S.W.3d at 785–86; *Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The length of the delay is, to some extent, a triggering mechanism, so that a speedy trial claim will not even be heard until passage of a period of time that is, on its face, unreasonable under the circumstances. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003). "If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652.

Here, the complaint was made August 29, 1987, and appellant was indicted on September 3, 1987, and filed his motion to dismiss alleging a speedy-trial violation on September 2, 2015, an interval of twenty-eight years. The State

4

concedes this delay is sufficient to trigger a full *Barker* analysis. We agree. *See Dragoo*, 96 S.W.3d at 314 (interval of three and one-half years sufficient to trigger examination of all factors); *Zamorano*, 84 S.W.3d at 649–50 (delay of two years and ten months in "plain-vanilla DWI case" sufficiently lengthy to trigger judicial review of other *Barker* factors); *Lopez v. State*, 478 S.W.3d 936, 942 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) (delay approaching one year is sufficient to trigger a speedy trial inquiry)). Thus, we conclude this factor weighs against the State. *Zamorano*, 84 S.W.3d at 649–50 ("Because the length of the delay stretched well beyond the bare minimum needed to trigger judicial examination of the [speedy trial] claim, this factor—in and of itself—weighs heavily against the State.").

B.    *Reason for the delay*

The burden of justifying the delay is on the State. *Cantu*, 253 S.W.3d at 280. In evaluating the State's reason for the delay, we assign different weights for different reasons. *Barker*, 407 U.S. at 531. Valid reasons for delay do not weigh against the State, whereas bad-faith delays weigh heavily against the State. *See Hopper v. State*, 495 S.W.3d 468, 474 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 520 S.W.3d 915 (Tex. Crim. App. 2017). A more neutral reason, such as negligence, will weigh less heavily against the State, but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the State rather than the defendant. *Barker*, 407 U.S. at 531.

The trial court's complete findings are set forth in Appendix A to this opinion. We take particular note of the following findings relative to appellant's departure from the State of Texas:

- After the complainant reported the offense to police, her grandfather confronted appellant;

5

- Appellant was aware of the charges against him;

- After charges were filed, appellant obtained an attorney; and

- During that time, appellant's attorney contacted the warrants division and stated he would attempt to contact appellant and post bond.

As regards the State's negligence in failing to find appellant, the following findings are of particular import:

- The original warrant for appellant's arrest incorrectly stated his year of birth as 19**;[2]

- The family of Appellant provided the investigator with Appellant's year of birth as 19**;

- There was no FBI number, juvenile number, spin number, or social security numbers for a person named Jesus Gabriel Zamarripa born in 19**;

- The name on the alien registration card was Jesus Gabriel Zamarripa Olivo, but in the Harris County database appellant was Jesus Gabriela Zamarripa;

- Appellant went to Mexico and later returned to the United States, and lived in Chicago;

- The State attempted to serve a warrant on Appellant at least seven times in the next several months;

- Following the service attempt in December 1987, appellant contacted DPS trooper Quinwin by telephone in reference to the case;

- Seven more service attempts were made from March 1998 to January 2001;

- The warrant was then placed in an inactive file pending additional or new leads;

- From April 2001 to April 2015, at least eighteen more attempts at service were made;

- At that time, an investigator added an alias date of birth of 19**;

- The next day, a service attempt resulted in a hold from Harris County being placed on appellant;

---

[2] The last two numerals of the year of appellant's birthdate, both correct and erroneous, have been replaced by asterisks (**) to avoid unnecessarily including an item of identifying information.

- Appellant signed a waiver of extradition and returned to Harris County shortly thereafter;

- Harris County was unaware of appellant's correct birthdate until 2015; and

- There were no records of appellant's move from Houston, either to Mexico or Chicago.

Our review of the record reflects there is evidence to support the trial court's findings, and the contrary is not established as a matter of law. From its' findings, the trial court concluded:

- Appellant left the jurisdiction of the State for twenty-eight years to avoid prosecution after having notice of the charges against him;

- The State exercised due diligence as shown by the more than thirty attempts to locate appellant and execute the warrant;

- The State was not negligent because of the variance in appellant's name and date of birth given to investigators as compared to the name and date of birth on his permanent resident card; and

- The incorrect information was "apparently given by [appellant's] family members."

Appellant challenges the trial court's conclusions. Appellant argues the second *Barker* factor weighs strongly in favor of determining his speedy-trial right was violated, because the delay "was predominantly attributable to the State's negligence," rather than his departure from Texas.

Appellant first contends the trial court "had no credible evidence he left Texas to avoid prosecution." Appellant relies upon the fact the complainant's mother testified he called and asked complainant's mother to drop the charges *before* he was indicted. The trial court expressly found this testimony was credible. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002) (stating an appellate court should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility of witness testimony). Appellant became "an accused," and his right to a speedy trial attached, when the complaint charging him with the offense was

7

filed in August 1987. *See Henson*, 407 S.W.3d at 767. Accordingly, the trial court's conclusion that appellant fled to Mexico and then went to Chicago to avoid prosecution is supported by the evidence.

Appellant also argues the trial court erroneously concluded the State acted with due diligence and was not negligent for failing to locate him sooner. Appellant faults the State for having incorrect identifying information.

The trial court concluded, and appellant does not contest, that the incorrect information was supplied by his family. Appellant claims the State made no attempt to locate him for "several periods of years." Appellant refers this court, without explanation or argument, to State's Exhibit 2, the warrant service attempts. Appellant does not identify when these periods occurred and cites no authority that these "gaps" in attempted service render the State's actions negligent. Nevertheless, the evidence shows, and the trial court's findings reflect, there is a gap from December 1987, when appellant contacted Trooper Quinwin by phone, until January 1994. Then, there is another gap until 1997. Thereafter, service was routinely attempted almost every year until appellant was located in Chicago. The record reflects the State attempted to execute the arrest warrant more than thirty times.

There is no evidence suggesting that the State's failure to locate appellant was deliberate or intentional. At most, the State's actions were negligent. On the other hand, the record supports a finding that appellant's actions constituted a deliberate and intentional attempt to avoid prosecution. Accordingly, we conclude the second *Barker* factor weighs against finding appellant's right to a speedy trial was violated.

C.    *Assertion of the right*

"The defendant has no duty to bring himself to trial; that is the State's duty." *Cantu*, 253 S.W.3d at 282. However, a defendant does have the responsibility to

assert his right to a speedy trial. *Id*. The lack of a timely assertion of the right indicates strongly that the defendant did not really want a speedy trial and was not prejudiced by not having one. *Dragoo*, 96 S.W.3d at 314. The longer the delay, the more likely that a defendant who really wanted a speedy trial would take some action to obtain one. *Id.* Thus, the longer the delay, the more heavily the continued inaction on the defendant's part weighs against a finding that the right was violated. *Id.*

Appellant contends he timely asserted his right to a speedy trial. His contention is premised upon the presumption that he had no responsibility to assert that right before the State located him in Chicago. However, the evidence in the record before us supports the conclusion that appellant was aware charges had been filed before he left Texas. Accordingly, appellant was on notice to assert his right to speedy trial. *See Doggett*, 505 U.S. at 653; *cf. Guajardo v. State,* 999 S.W.2d 566, 570 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (noting defendant's first opportunity to assert her right to a speedy trial was immediately following her arrest because prior to that time appellant had no notice that she had been indicted). Here, appellant failed to assert his speedy-trial right for twenty-eight years, although he had obtained counsel before leaving Texas. *See Hopper*, 520 S.W.3d at 928 ("Because we have determined that the record supports a conclusion that appellant knew about his Texas charge, his complete failure to assert his right to a speedy trial for more than eighteen years suggests that he did not really want a speedy trial."); *Lott v. State*, 951 S.W.2d 489, 495 (Tex. App.—El Paso 1997, pet. ref'd) (factor weighed against appellant when the evidence "support [ed] a finding that Lott, knowing of the charges, chose to remain at large for more than thirty years without ever demanding a trial.").

Moreover, appellant did not file his motion to quash for four months after his extradition to Harris County but instead signed several case resets. Counsel for

appellant was appointed on May 4, 2015. At that time, the case was reset until June 2015. The case was reset three more times before appellant filed a "Memorandum Supporting Jesus Zamarripa's Motion to Quash Indictment For Lack of Speedy Trial" in September 2015. The case was reset three more times. In June 2016, a hearing was held on the motion to quash. We exclude this time from the speedy-trial calculation because agreed resets are inconsistent with the assertion of the right to a speedy trial. *Smith v. State*, 436 S.W.3d 353, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). The trial court denied the motion in August 2016 and trial was held five months later, in March 2017.

Taking all the circumstances into consideration, this factor weighs heavily against appellant.

D.    *Prejudice*

We evaluate the final factor, prejudice to the defendant caused by the delay, in light of the interests that the speedy-trial right was designed to protect. *See Barker*, 407 U.S. at 532. The Supreme Court has identified three such interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize the defendant's anxiety and concern; and (3) to limit the possibility that the defense will be impaired. *Id*.; *see State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999). Of these interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 S.W.3d at 532.

The defendant has the burden to make some showing of prejudice, although a showing of "actual prejudice" is not required. *Barker*, 407 S.W.3d at 532. If the defendant makes a *prima facie* showing of prejudice, the burden shifts to the State to prove that the defendant suffered "no serious prejudice beyond that which ensued from the ordinary and inevitable delay." *Id*. Furthermore, if the State fails to

persuasively rebut the presumption of prejudice, the defendant is entitled to relief. *Doggett*, 505 U.S. at 658.

Appellant makes no argument as to the first two interests. Accordingly, his claim of prejudice necessarily turns on the third identified interest—the possibility that his defense was impaired by the delay. Appellant first contends the long delay in his case presumptively compromises a trial's reliability. Even so, given that the State pursued appellant with reasonable diligence, the prejudice element will not weigh in appellant's favor, no matter how long the delay, absent "specific prejudice to [appellant's] defense." *Doggett*, 505 U.S. at 655–56.

Appellant offers only three bases for finding prejudice:

- Trial counsel's inability to investigate;
- The complainant's video-taped interview is now missing; and
- The swabs taken during the complainant's SANE examination are no longer available.

Appellant fails to inform this court as to any matter counsel would or could have investigated. His only record reference is to his motion and not to any evidence before the trial court. Appellant does not explain how the lack of any such investigation impaired his defense.

The record reflects appellant had access to a report that would reflect "[p]retty much everything that was on the recording" of the complainant's video-taped interview. Appellant does not acknowledge this and makes no argument that his ability to access the report failed to ameliorate the effect of the missing video on his defense.

The complainant's SANE examination was conducted almost a year after the offense occurred because it was a delayed outcry. Because the swabs were taken

long after the aggravated sexual assault, the possibility that appellant's defense was impaired by his inability to examine them is minimal, at best.

Appellant fails to make a *prima facie* showing that his ability to defend himself was prejudiced by the delay. *See Barker*, 407 U.S. at 533–34 (where defendant was not seriously prejudiced by five-year delay between arrest and trial and defendant did not want speedy trial, defendant's Sixth Amendment right to speedy trial not violated); *Phipps v. State*, 630 S.W.2d 942, 946 (Tex. Crim. App. 1982) (where defendant demonstrated no prejudice by four-year delay between arrest and trial and defendant waited until one month before trial to assert his right to a speedy trial, defendant's Sixth Amendment right to speedy trial not violated). We therefore conclude this factor weighs against finding a speedy-trial violation.

E.     *Balancing the factors*

Having addressed the four *Barker* factors, we must now balance them. *See Barker*, 407 U.S. at 533. "[C]ourts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Cantu*, 253 S.W.3d at 281.

The first factor weighs in favor of concluding appellant's right to a speedy trial was violated because the delay was lengthy. Because the delay was explained and appellant bears a significant portion of the responsibility for the delay, the second factor weighs against determining his right was violated. Appellant's decision to flee the State of Texas rather than stand trial and his acquiescence in further delay also weighs against finding a violation. Lastly, appellant's failure to demonstrate specific prejudice by the delay weighs against determining a violation of his right to a speedy trial was violated.

12

Having analyzed the *Barker* factors, we conclude that, on balance, the evidence in this case fully supports the trial court's ruling. *See Cantu,* 253 S.W.3d at 286. We therefore conclude that, as a matter of law, appellant was not denied his right to a speedy trial. Accordingly, the trial court did not err in denying appellant's motion to dismiss and we overrule appellant's sole issue.

## CONCLUSION

The judgment of the trial court is affirmed.

/s/ Margaret "Meg" Poissant
Justice

Panel consists of Justices Wise, Jewell, and Poissant.

Publish — Tex. R. App. P. 47.2(b).

## APPENDIX A

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

. . . The Court makes the following findings based upon the state of the record, the evidence adduced at the trial and findings [sic] from the credible evidence the following:

1. The defendant was indicted in this cause on September 3rd, 1987, for the offense of aggravated sexual assault of a child younger than 14 years of age.

2. The indictment alleged that in Harris County, Texas, the defendant on or about August 31st, 1986, did then and there unlawfully, intentionally and knowingly cause the penetration of a female sexual organ of [L.T.] — a person younger than 14 years of age and not his spouse by placing his sexual organ in the female sexual organ of the complainant.

3. The complaint was filed on August 29th, 1987, as a to-be arrested for a non-arrest case. And the probable cause affidavit in the arrest warrant/commitment asserted that the complainant, then 10 years old, told the Houston police officer that the defendant, her uncle, had sexual intercourse with her in May in '86, and again in August, 1986.

4. A TCIC/NCIC database check was done and the defendant was clear. A warrant for defendant's arrest was issued on August 30th, 1987, and the warrant was entered on TCIC/NCIC database on September 1st, 1987, and returned unexecuted on September 4th, 1987, by the Harris County Sheriff's Office.

5. The cause was indicted on September 3rd, 1987.

6. On April 7th, 2015, the defendant was detained in Chicago, Illinois and waived extradition and was brought back to Houston, Harris County jail on April 23rd, 2015, or the 22nd, and booked in the Harris County jail as set out in Defendant's Exhibit No. 2, Harris County Sheriff printout booking information sets out his Sheriff office number, his Athis number, no FBI number, no juvenile number, no spin number, no Social Security number, with the last name Zamarripa, first name Jesus, middle initial Gabriel, birth date 19**/02/18, height 5-6, and other descriptors. Booking date 2015/4/22. Said booking was almost 28 years after the charges were filed.

14

7. On May 4th, 2015, the defense counsel, Jimmy Ortiz, was appointed to represent the defendant.

The record will reflect he's at counsel table at this time.

8. On June 26, 2015, the Court granted defendant's counsel motion for investigators funds and access to the Harris County jail to visit with the defendant with the aid of a laptop computer.

9. On July 1st, 2015, the defense counsel reset the case for a "disposition" setting . . . for July 29, 2015.

10. On July 29, 2015, the defense counsel reset the case for another "disposition" setting for September 2nd, 2015.

11. On September 2nd, 2015, the defense counsel filed a memorandum supporting Jesus Zamarripa's motion to quash indictment for lack of a speedy trial.

12. On October 7, 2015, the case was reset by the defense counsel to November 30th, 2015, for a motion, "hearing" to dismiss for lack of a speedy trial.

13. . . . On November 30th, 2015, the case was reset for "motion speedy trial" to January 29th, 2016. And there was a couple of other settings, if I'm not -- that do not have reset forms. But then on May 6th, 2016, the case was reset to June 10th, 2016, for a motion setting where a hearing on defendant's motion to quash indictment for lack of a speedy trial was heard.

15. The hearing established the facts set out in findings 1 through 6 set out above and the record establishes findings 7 through 14 above.[3]

16.[A]. The hearing also established that per the State witness, Maria -- no, Mona Hampton, based on her credible evidence, the hearing established that Maria Hampton complaining witness's mother and sister-in-law of the defendant out-cried to – received an outcry of statement from the complaining witness about the sexual abuse by the defendant, and the following day, she took the complaining witness to the police station. . . ..

B. Ms. Hampton told her father, her own father, about the accusation, who is the grandfather of the complainant, and the father

---

[3] There is no paragraph 14.

15

confronted the defendant at his and his wife's apartment. I guess his wife being Ms. Hampton's sister, Aurora, in a house in a neighborhood Denver Harbor here in Houston, Texas.

C. Ms. Hampton's credible testimony was that the defendant and his wife Aurora left her father's house and went to stay at another sister's house named Martha.

D. Ms. Hampton's credible testimony was that the defendant and the wife Aurora went to live in Mexico and one of her brother's saw them in Monterrey, Nuevo Leon, Mexico. Ms. Hampton informed the officers two or three weeks later that the defendant was in Mexico.

E. Ms. Hampton's credible testimony further sets out that her sister Aurora had stayed in Mexico one or two years and then the defendant went to Chicago afterwards and Aurora stayed in Mexico for a while and later joined the defendant in Chicago. When this knowledge was first learned by Ms. Hampton is unclear in the record.

F. Ms. Hampton learned from her sister that after charges were filed, the defendant got an attorney.

G. Ms. Hampton later told the officers that the defendant had gone to Chicago and in July of 1987, pre-indictment, that defendant was back in Houston on Bureau Street with her other sister Martha.

H. Ms. Hampton further testified credibly that defendant called her several times and was aware of the charges against him and he questioned her to "drop the charge, that he had not been -- that he had not done nothing wrong". And the defendant went to Chicago after charges had already been filed and stayed there until he was found.

I. Ms. Hampton also credibly testified that the indictment was returned a few days after she met with the police. The record will reflect the indictment was returned approximately one year after the charge was filed. The indictment was returned September 3rd, 1987. The charge was filed August 29th, alleging the commission of the offense -- August 29th 1987, alleging the commission of the offense occurring on August 31st, 1986.

17. The hearing also established by the credible testimony of Sergeant Gary Ellison, Harris County Sheriff's Office Criminal Warrant Division the following:

16

A. We should provide 16 investigators and 4 or 5 clerks and currently had 32,000 warrants in the system out of Harris County.

B. The records, State's Exhibit No. 2 of warrants, service attempts for the defendant Jesus Gabriel Zamarippa, . . ., aggravated sexual assault of a child, indicated that the original warrant was issued 8/30/87 and was received by his department on 8/31/87 and entered on TCIC/NCIC on 9/1/87 with the date of birth of the defendant as February 18, 19**.

No. 1) The next service date was 9/4/87 where a warrants investigator went to 13030 North Bureau Street, Apartment 912, Houston, Texas, two times where the defendant's sister-in-law says -- or the defendant's sister-in-law, Ms. Hampton said the defendant moved -- strike that -- went to that apartment where the defendant's sister-in-law, unnamed -- the Court reasonably infers that it was Martha -- says the defendant moved three weeks prior to another apartment around the West Park area.

No. 2) All right. The next service attempt date was September 6th, 1987. Defendant's father-in-law, Jesus Escarino and grandfather complainant, regarding the address of the defendant, and complaining witness mother advised that the last known address of the defendant was the 13030 North Bureau address.

No. 3) The next service attempt on 9/8/87, indicates defense attorney Carlos Garcia was contacted by the warrants division. And the notation is that Mr. Garcia stated that he would attempt to contact the defendant and post bond.

No. 4) The next service attempt was 10/7/87. The investigators contact the complaining witness's mother, Ms. Hampton, for additional information, but no additional information was noted.

No. 5) The next service attempt was 10/15/87 to check by with the complaining witness at 1506 West Alabama for additional information. The complainant was gone on arrival.

No. 6) The next service attempt was 12/01/87. The notation is that a DPS trooper by the name of Quinwin,. . . was contacted and the defendant -- it's noted that the defendant had contacted him in reference to the case by phone but had not seen or heard from the defendant since that contact.

No. 7) The next service attempt was 01/13/94. An employee or investigator by the name of Friend counseled with TCIC/NCIC due to the lack of information. The notation was the Texas ID no longer returns to subject.

No. 8) The next service attempt was 01/1997, where another investigator or clerk Reindl, . . . did an audit which the Court -- which the witness explained to the Court was the same thing as a purge. And a purge was noted on most of these -- a lot of these warrant and service attempts. The word purge. That means to check and see if additional information was found. Check the warrant -- check the warrant information.

No. 9) The next service attempt was 3/25/98. And a person named Compere, . . . read another purge for audit and no results.

No. 10) The next attempt 2/15/99, another person Speer did another audit and no result.

No. 11) The next service attempt was 8/10/2000. The notation is defendant's location being researched in the . . . Claws System. No new information found for the investigators to look at.

No. 12) The next service attempt was January 3rd, 2001. The notation of the defense location being researched in the Claws System.

No. 13) the next service attempt was January 6, 2001. A clerk or investigator Talton did another purge and made a notation. No additional information for this defendant. All known information was researched and found to be bad -- 87 with no forwarding address. Auto track/nationwide/TEC/SSDI/DPS/INS were all researched in a possible or located, but upon further research, they did not match our wanted.

This warrant placed in inactive file per 342 pending any additional/new leads.

No. 14) The next service attempt is 4/30/2001. The defendant's location being researched in the Claws System.

No. 15) The next service attempt is August 7, 2002. The notation, the defendant's location being researched in the Claws System.

No. 16) The next service attempt is 6/3/04. Investigator by the name of Speer conducted another purge or audit.

No. 17) The next service attempt is 6/17/04. The defendant's location being researched in the Claw System.

No. 18) The next service attempt is 6/1/ 05. The clerk or investigator named Seals purge that again. (Phonetic)

No. 19) The next service attempt is September 5th, 2006. The clerk or investigator Seals purge it again.

No. 20) The next warrant service attempt is January 18, 2007. A person named Myers purged it again.

No. 21) The next warrant service attempt is April 21st, 2008. A person named Talton purged it again. And these purges without any further comments means no results.

No. 22) The next service attempt is January 22nd, 2009. The person named Stillhammer searched for Harris County civil case for subject by name, which no result.

No. 23) The next warrant service attempt is May 19, 2009. A person named Garcia purged it again.

No. 24) The next warrant service attempt is December 8th, 2011. A person named Tomez made a note. Crime Stoppers subject will be featured on Crime Stoppers website.

No. 25) The next warrant service attempt is on April 3rd, 2012. Again, at the original address 13030 North Bureau No. 912 or 913. It looks like 913 here. Bad address. No new leads.

No. 26) The next service attempt was on August 20, 2012. It was a warrant audit. No driver's license or ID found for the subject, no Social Security listed to check for work history through TWC or TAS.

No. 27) The next service attempt was on September 25th, 2014. A person by the name of Pearce, it looks like, did an audit -- audited on 2014.

No. 28) The next service attempt was on November 13, 2014. An investigator Shannon entered TCIC/NCIC warrant number -- well, the Court believes these were the warrant numbers. It says W582280668, and a notation is to go out nationwide and Texas-wide.

No. 29) the next service attempt was March 15, 2015. The investigator Palmer re-checked the warrant to make sure that everything was entered correctly.

No. 30) the next warrant service attempt was March 25, 2015. It looks like investigator Lopez made a notation, warrant assigned D.

Parusic with the Gulf Coast Task Force, which the Court heard was comprised of the US Marshals Office, the Harris County Sheriff's Office and other agencies. (Phonetic)

No. 31) The next warrant service attempt was April 6th, 2015. Investigator Shannon added the alias date of birth of 2/18/** to entry per Harris County District Attorney's Office personnel named Kim Bryant. This new date of birth was different from the original date of birth in the system of 2/18/**.

No. 32) The next service attempt was April, 7, 2015. Investigator B. Polk received a teletype from Chicago PD, Illinois. A hold from Harris County was placed on the defendant.

No. 33) the next warrant service attempt April 8, 2015. Investigator B. Polk -- notation here that received a teletype from Chicago PD, Illinois advising subject has signed waiver of extradition and is ready for pick up.

And No. 34) the next service attempt is dated April 8th, 2015. B. Polk indicates trip, board Chicago, Illinois PD.

No. 35) The next service attempt dated 4/22/15. Arnaba, the notation is that the subject was extradited from Chicago PD to CWC without incident. (Phonetic)

All right. No. 18. The record reflects that the defendant's permanent resident card Defendant's Exhibit No. 5 indicates the defendant's date of birth was April -- on that card was April 18th, '**. And the name on the alien registration card was Zamarripa Olivo, Jesus Gabriel. And the card noted residence since 07 /20/82. Date in Harris County system indicated date of birth was 02/18/**, not '**. And the database name was Zamarripa, Jesus Gabriela.

No. 19. The Court finds that from June 13, 1994 through 11/13/2014, the defendant was taken out of the TCIC/NCIC system when it was canceled on 6/13/94 by someone at the Sheriffs's department.

No. 20. The Court finds that ADA investigator on 11/13/2014 checked a new program called the TLO Raptor program which came online in 2014, and accessed and found in Illinois TDL belonging to the defendant.

20

No. 21. The Court finds that Harris County . . . per Sergeant Ellison didn't know the defendant's date of birth was 02/18/** until 2015.

No. 22. The Court finds that it was not until April 6th, 2015, that the new date of birth of 02/18/** and 02/18/** were linked in defendant's subsequently arrested.

No. 23. The Court further finds that no records from the Harris County Warrants Division or elsewhere indicated the defendant's move to Chicago -- the defendant had moved to Chicago or went to Mexico or came back to Houston.

Conclusions of Law No. 1: In determining whether the defendant has been deprived of his constitutional right to a speedy trial in this cause, the Court has weighed and balanced the four factors identified by the Supreme Court in Barker versus Wingo 407 US 514 [sic] as well as the holdings of the case of Cantu versus State, 253 S.W. 3rd 273rd, Court of Criminal Appeals case in 2008 [sic] and other authorities tendered by the State and the defense, I believe.

No. 2. The Court finds and concludes that at the time between the date that the charges were filed in this cause on August 29, 1987, and the time the defendant was arrested in Illinois on April 7th, 2015, and brought back to Harris County on April 22nd or 23rd, 2015, almost 28 years had elapsed.

No. 3. The four factors, the four Barker factors, they need to be weighed and balanced to include 1 through 4. 1.) A length of delay. 2.) The reason for the delay. 3.) The assertion of the right to get speedy trial. 4.) Prejudice through the accused.

No. 4. As to the length of delay issue, the Court finds 28 years is presumptively prejudicial.

No. 5. As to the reasons for the delay issues, this Court finds that Zamarripa left the jurisdiction to avoid prosecution according to the credible testimony of R. Hampton, the complaining witness's mother who also served as the outcry witness and testified credibly that the defendant requested on several occasions that she drop the charges.

1) There was evidence from Ms. Hampton that he first left Houston from Mexico and then left Mexico for Chicago, Illinois shortly after the charges were filed on August 29, 1987. And prior to indictment, almost a year later on September 3rd, 1987, one full year

after the charges were filed. However, there was no evidence from the State's position and there are various and numerous warrant service attempts that they had any information from the complainant's mother, Ms. Hampton, or anyone else including his attorney, Carlos Garcia, that the defendant had left Houston and resided in Chicago, Illinois.

2.) State's Exhibit No. 2 sets out 32 plus, probably 36, 38 warrant service attempts as to the warnings in this cause number. It sets out the defendant's descriptors 5-6, with date of birth of 02/18/**, all of which were put in the Harris County warrants database on 9/01/87 and entered under TCIC/NCIC database.

Several attempts were made to locate the defendant at its last known address on North Bureau in person as well as contacts with the complaining witness's mother and complaining witness's grandfather.

3.) State's Exhibit No. 2 sets out five additional warrant service attempts until the 6th warrant on December 1st, '87, which indicated DPS trooper informed the warrants division that he had spoken by phone with the defendant regarding the case.

And on 09/7/87, the defendant's attorney Carlos Garcia was contacted and he stated that he would attempt to locate the defendant and make bond.

4.) The defendant's actual name according to his personal -- according to his permanent residence alien card was different from that on file with the indictment and on file with the warrants division. His name on the indictment was Jesus Gabriel Zamarripa with the date of birth of 2/18/**, which was on all TCIC/NCIC database as well. His name and date of birth was Jesus Zamarripa Olivo and 02/18/** was on his permanent resident card. The Court is now stating which one is the correct number or correct date of birth.

5.) The defendant's date of birth and name apparently were canceled on TCIC/NCIC on January 13th, '94 about seven years after it was first entered on 9/1/87 by Harris County Sheriff's Office warrants clerk or investigator due to lack of information.

6.) Thereafter, the 7th warrant service attempt was made on January 19, 1997. An audit was made, a purge was made, no further information.

7) Further warrant service attempts were made annually, 1998, '99, 2000, 2001. In 2001, eight possible – "possible" were located, but did not match this warrant on defendant.

8) In 2001 and 2002, the defendant was placed in a new CLAWS system. In 2004, two more audits were run on the warrant. And again in 2006, 2007, 2008, 2009, to no avail. No new information.

9) On December 8th, 2011, his information was featured on the Crime Stoppers website.

10) On April 12, 2012, his last known address was visited again and came back as a bad address, the 13030 North Bureau address.

11) On August 20, 2012, another audit was done. And on 9/25/2014 both with no new results.

12) On 11/13/2014, the investigator Shannon entered TCIC/NCIC with a warrant number previously stated 5822808668 and it went out nationwide and Texas wide.

13) And then again on 03/15/2015, investigator Palmer re-checked the warrant for correct entry. And 3/25/15, the warrant was assigned to the Gulf Coast Task Force. And on 4/06/15, about two weeks after it was transferred to them, investigator Shannon entered a new date of birth on defendant of 02/18/** and the defendant was arrested in Chicago on 04/07/15. Returned to Harris County custody on 04/23/15.

14.) The 30 plus warrant service attempts to locate the defendant and execute the warrant was due diligence on the part of the State and was not negligence on the part of the State or the prosecution.

15) The difference in defendant's name and date of birth as given to the police investigation or investigators as compared to the name and date of birth on the defendant's permanent residency card was a discrepancy based upon the information, available information, as to the defendant's true name and date of birth apparently given by the defendant's family members.

No. 6. As to the assertion of the right to a speedy trial issue, the Court finds and concludes:

1) That the defendant knew of the pending charges when he requested Ms. Hampton to drop the charges and left Houston or Mexico or parts unknown before the indictment to avoid prosecution.

23

2) His leaving the jurisdiction combined with a different name and date of birth [than] the one on his permanent residency card as set out in Defense Exhibit 55, frustrated the State's attempts to prosecute him.

3) The defendant since he was charged with the offense on August 29, 1987, and the present time has not asserted his right to a speedy trial and none of the various resets since his initial court setting in this court on May 4th, 2015, has the defendant asserted his right to a speedy trial.

7. As to the fourth factor prejudiced to the defendant issue, the Court finds and concludes:

1.) The defendant has not requested a speedy trial and any pretrial incarceration has not been due. And the State's failure to try the case or the Court's lack of an interest in minimizing the defendant's anxiety and concern, but rather the defendant's acquiescence and delay without an assertion for a speedy trial.

2.) The defendant has presented no evidence to support a showing that his offense or prejudice accordingly the Court concludes and holds that weighing the Barker factors, that the delay was excessive and presumptively prejudicial, but was extenuated by the defendant's intentionally leaving the jurisdiction of the State for 28 years to avoid prosecution after having notice of the charge against him and by his non-assertion of his right to a speedy trial after he was arrested and his -- after he was arrested on the warrant and his acquiescence and the delay while in custody.